UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WEB DESIGN AND CONSULTING ) <br> SERVICES INC. and AD.COM ) <br> INTERACTIVE MEDIA INC., ) <br> ) <br> Plaintiffs ) <br> ) <br> v. ) <br> ) <br> MICHAEL ARAGON, ) <br> ) <br> Defendant ) | No. 2:24-cv-00249-KFW |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

Web Design and Consulting Services Inc. and Ad.com Interactive Media Inc. (AdMedia) (collectively, the "Company") move for a preliminary injunction that would prevent their former employee Michael Aragon from soliciting any of AdMedia's current customers as well as its prospective customers with whom he had contact while employed, soliciting any of AdMedia's employees to leave their jobs, or "using, disclosing, sharing and/or transferring" any of the Company's confidential information, and require Aragon to return all of the Company's equipment without modifying it or deleting the data contained therein and to send the Company all the confidential information in his possession before immediately and permanently deleting any copies of it. Amended Motion (ECF No. 10) at 1; Fed. R. Civ. P. 65(a). For the reasons below, the Company's motion for a preliminary injunction is denied.[1]

---

[1] Because Aragon has appeared and opposed the Company's motion, I will treat it as a motion for a preliminary injunction notwithstanding the fact that it was styled as a motion for a preliminary injunction and/or temporary restraining order.  *See* 11A Mary Kay Kane, *Federal Practice and Procedure* § 2951, Westlaw (database updated June 2024).

1

## I. Factual Background

Web Design and AdMedia are California corporations with their principal places of business in Los Angeles, California. *See* Declaration of Daniel E. Bibi (ECF No. 11) ¶¶ 6-7; Affidavit of Michael Aragon (ECF No. 16-1) ¶ 13. Web Design is AdMedia's parent company. *See* Bibi Decl. ¶ 7. "AdMedia is a digital marketing company and advertising network providing advertising services to advertisers, publishers, and consumers . . . across online channels, including industry leading email, domain, social and search networks." *See id.* ¶ 5.

The Company employed Aragon as its Vice President of Sales from August 2018 to March 2024, during which time he sold AdMedia's products and services, established and maintained relationships with customers and potential customers, and managed AdMedia's sales representatives. *See id.* ¶¶ 10, 15. A "significant part" of Aragon's work for AdMedia involved traveling to industry tradeshows across the country to meet and develop relationships with prospective customers. *Id.* ¶ 17.

When Aragon was first hired by AdMedia, he worked from its office in Los Angeles, California, but after the COVID-19 pandemic hit, Aragon began working remotely from his home in Silver Lake, California. *See* Aragon Aff. ¶¶ 13-14. Then in December 2021, Aragon moved to Maine, where he continued to work remotely for AdMedia and regularly travel to attend out-of-state trade shows. *See id.* ¶¶ 15-17.

Through his role, Aragon had access to the Company's confidential and proprietary information, including its "entire customer relationship management (CRM) database; accounting information; historical pricing data relating to current

2

and former . . . customers; prospective customer data, patented search technologies . . . ; financial [and accounting] data . . . ; and unique advertising and technology methodologies." Bibi Decl. ¶ 19. Accessing this information required Aragon to log into the Company's password-protected system, which tracked what information he accessed and when, and whether he downloaded it. *See id.* ¶¶ 20-21.

In March 2024, Aragon resigned from AdMedia. *See id.* ¶ 22. It was later discovered that, prior to his resignation, Aragon had accessed the Company's CRM database, which contained "customer and prospect names and contact information, sources of customer/lead capture, customer purchase and/or inquiry details, sales interactions and contracts, accounting information, and historical pricing data, including data for numerous customers entirely unrelated to [him]." Second Declaration of Daniel E. Bibi (ECF No. 25-1) ¶ 12; *see also* Aragon Aff. ¶¶ 20-24.

In April 2024, Aragon began working for Ad.net—one of the Company's direct competitors—as its Vice President of Sales and Strategic Alliances. *See* Bibi Decl. ¶¶ 34-35. Soon after, seventeen of the Company's customers, all of whom had direct contact with Aragon before he resigned, took their business elsewhere, including Autoweb, one of AdMedia's major customers, which moved its business to Ad.net. *See id.* ¶ 38; Second Bibi Decl. ¶ 11. Further, several of the advertisers that Aragon worked with directly while employed by AdMedia began to "drastically reduce" the services they typically purchased. *See* Bibi Decl. ¶ 37.

Two of AdMedia's employees also joined Aragon at Ad.net. *See id.* ¶¶ 41-44. Sandy Lechner, who attended trade shows on AdMedia's behalf like Aragon, departed

3

for Ad.net soon after Aragon resigned. *See id.* ¶¶ 41-42. Then in July 2024, Paul Shuster, AdMedia's Vice President of Enterprise Sales, resigned and indicated that, "prior to his departure, he had been discussing his resignation" with Aragon. *Id.* ¶ 43. Shuster now works as Ad.net's Vice President of Sales. *See id.* ¶ 44.

## II. Confidentiality and Non-Solicitation Agreement

When the Company hired Aragon, it required him to execute a confidentiality and non-solicitation agreement (CNSA) containing several provisions protective of its confidential and customer information. *See id.* ¶¶ 11-12. The CNSA defines "Customer Information" as "all data pertaining or identifiable to a Company customer including, without limitation, [(1)] name; address; e-mail address; financial information; preferences; demographic data; marketing data; data about technology; and [(2)] any information that reflects use of or interactions with a Company product or service." CNSA (ECF No. 11-1) at 1. "Confidential Information" is that which pertains to "the Company's databases, programs, models, displays and manuals, and the selection, coordination, and arrangement of the contents of such materials, unpublished information concerning research activities and plans, marketing or sales plans, pricing or pricing strategies, operational techniques, strategic plans, Customer Information . . ., and unpublished financial information . . . ."[2] *Id.*

The relevant CNSA provisions are as follows, quoted in pertinent part:

1. Confidentiality; Confidential Information; Customer Information

a. Treatment of Confidential Information. . . . Employee agrees that he/she will hold any and all confidential information in the strictest

---

[2] Because the Company's "Customer Information" is subsumed in its "Confidential Information," I will refer to the two collectively as "confidential information" throughout this order.

4

confidence and will use and permit use of Confidential Information solely for the benefit of Company in the course of its business dealings.

b. Customer Information. . . . Customer Information (as defined herein) is and will remain the sole and exclusive property of Company.

c. Treatment of Customer Information. During the terms of this Agreement and thereafter in perpetuity, Employee shall not gather, store, or use any Customer Information in any manner and will not disclose, distribute, sell, share, rent or otherwise transfer any Customer Information to any third party, except as Employee may be expressly and reasonably directed in advance in writing by Company.

d. Return of Confidential and Customer Information. On Company's written request or upon termination of employment, Employee will promptly return or destroy, at Company's option, all originals and copies of all documents and materials it has received or obtained[,] or which are otherwise in the possession of Employee containing Company's Confidential Information, including Customer Information.

. . .

3. Solicitation of Company's Customers. During the term of this Agreement and thereafter for three (3) years, Employee agrees not to use the Customer information to target or solicit Company's Customers on behalf of himself/herself or any third party . . . .

4. Non-Solicitation of Company's Employees. During the term of your employment and continuing for three years following the termination of the same, Employee shall not solicit or otherwise recruit or induce any employee of Company to work for any other third party or to otherwise terminate his/her employment with the Company to work elsewhere.

*Id.* at 1-2; *see also* Bibi Decl. ¶ 12.

### III. Procedural History

The Company commenced this action against Aragon in July 2024 and, a month later, filed an amended complaint alleging five counts: (1) breach of contract (solicitation of the Company's customers); (2) breach of contract (solicitation of the Company's employees); (3) breach of contract (misuse of the Company's confidential

5

information); violation of the Maine Uniform Trade Secrets Act (MUTSA), 10 M.R.S. §§ 1541-1548; (4) Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1831-1839; and (5) breach of fiduciary duty and the duty of loyalty. *See* Amended Complaint (ECF No. 7) ¶¶ 33-79; *see generally* Complaint (ECF No. 1). Then in August 2024, the Company filed the instant motion for a preliminary injunction. *See* Amended Motion at 1.

On March 12, 2025, I held oral argument on the motion during which the Company asked, for the first time, that I conduct an evidentiary hearing to further develop the record. Although the Company's allegations regarding Aragon's conduct and its resulting losses are conclusory and disputed, *see* Bibi Decl. ¶¶ 36-44; Amended Motion at 10-17; Reply (ECF No. 25) at 9-12; Aragon Aff. ¶¶ 20-28; Opposition (ECF No. 16) at 11-18, I declined to hold an evidentiary hearing because the gaps in evidence are irrelevant to this decision and the resolution of the case was already delayed by the Company's failure to timely obtain counsel. The parties also declined my offer to expedite final disposition of the case on the merits.

### IV. Choice of Law

As a threshold matter, the parties dispute whether California or Maine law applies to the Company's breach of contract claims: the Company argues that Maine law controls and permits enforcement of the relevant CNSA provisions, *see* Reply at 3-4, while Aragon insists that California law applies and prohibits the

6

same, *see* Opposition at 4-6.³  The CNSA is silent as to which state's law governs the parties' contractual relationship.  *See generally* CNSA.

"The first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions . . . ." *Reicher v. Berkshire Life Ins. Co. of America*, 360 F.3d 1, 4 (1st Cir. 2004).

Broadly speaking, the three major concepts at issue in the CNSA are its restrictions on Aragon's post-termination ability to solicit the Company's customers, solicit the Company's employees, and use the Company's confidential information. *See* CNSA at 1-2.  These components functionally restrain Aragon from engaging in his profession, which is generally against public policy under both Maine and California law.  *See Chalet Susse Int'l., Inc. v. Mobil Oil Corp.*, 597 A.3d 1350, 1353 (Me. 1991); *Blue Mountain Enters., LLC. v. Owen*, 74 Cal. App. 5th 537, 550 (2022).

Maine will enforce an employer's contractual restrictions on a former employee's trade so long as the agreement is reasonable under the circumstances and its scope is no wider than necessary to protect the employer's business interests. *See Roy v. Bolduc*, 140 Me. 103, 107, 34 A.2d 479, 480-81 (1943); 26 M.R.S.A § 599-A

---

³ As the Company points out, *see* Reply at 8 n.9, MUTSA and the California Uniform Trade Secrets Act (CUTSA), Cal. Civ. Code §§ 3426-3426.11, do not differ in any way relevant to this case; accordingly, I need not conduct a choice of law analysis on that issue.  *See Okmyansky v. Herbalife Int'l. of America*, 415 F.3d 154, 158 (1st Cir. 2005) ("[W]hen the resolution of a choice-of-law determination would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls.").  Separately, because the Company omits any discussion related to its DTSA or breach of duty claims, *see* Amended Motion at 10-19; Reply at 5-12, I will consider any argument that those claims support granting a preliminary injunction waived, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

(Westlaw Mar. 31, 2025).[4] This reasonableness approach applies to agreements that set geographic or temporal restrictions on a former employee's ability to work or prevent them from using their former employer's "trade or business secrets, and other confidential knowledge gained in the course of the employment, and from enticing away old customers . . . ."[5] *Roy*, 140 Me. at 107, 34 A.2d at 480-81; *see also Sisters of Charity Health Sys. Inc. v. Farrago*, 2011 ME 62, ¶¶ 6, 12, 21 A.3d 110 (holding that an agreement barring employees from practicing medicine with certain entities within a twenty-five mile radius of their former employer for two years post-termination reasonably protected the employer's legitimate interest in its patients and goodwill because the former employees "had direct contact with . . . patients and were in a position to appropriate the [employer's] good will"); *Bernier v. Merrill Air Eng'rs.*, 2001 ME 17, ¶ 18, 770 A.2d 97 (holding that a non-disclosure clause barring a former employee "from using particularized, highly specialized protected original work" that he became privy to while employed

---

[4] Section 599-A was enacted in 2019 and reinforces Maine's position that noncompete agreements (which it narrowly defines as contracts that bar employees "from working in the same or similar profession or in a specified geographic area for a certain period of time" post-termination), like broader restraints on trade, are "contrary to public policy" but will be enforced if "reasonable and . . . no broader than necessary to protect" an employer's legitimate business interests. 26 M.R.S. § 599-A(1)-(2). Although the Maine Supreme Court has yet to speak on whether cases predating its enactment remain valid, Maine's trial court has both relied on and found the statute's public policy position consistent with relevant precedent. *See Hamilton v. Rubsamen*, No. CV-21-141, 2021 Me. Super. LEXIS 136, at *1-2, 6-7 (July 8, 2021); *see also Torres-Ronda v. Nationwide Mut. Ins. Co.*, 18 F.4th 80, 84 (1st Cir. 2021) ("In the absence of more convincing evidence of what the state law is, an intermediate state court decision should be followed by a federal court in deciding a state question." (cleaned up)).

[5] I have been unable to find case law that sheds light on whether an employee non-solicitation clause is enforceable under Maine law, but the answer does not alter my ultimate decision because, as discussed below, (1) such provisions are likely unenforceable under California law and, (2) conflicts of law principles dictate that California law governs in the event of a conflict between Maine and California contract law (such as if Maine does, in fact, enforce employee non-solicitation clauses).

reasonably balanced the parties' interests by protecting "information that d[id] not rise to the level of a trade secret but [was] more than general skill or knowledge").

California, on the other hand, "settled public policy in favor of open competition, and rejected the common law 'rule of reasonableness'" approach to restraints on trade, when its legislature enacted section 16600 of the California Business and Professional Code. *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 945 (2008) (citing Cal. Bus. & Prof. Code, § 16600). Section 16600 dictates that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void," and that the "section shall be read broadly . . . to void the application of any noncompete agreement in an employment contract, or any noncompete clause in an employment contract, no matter how narrowly tailored," that does not meet one of the exceptions the chapter enumerates, none of which apply to this case.[6] Cal. Bus. & Prof. Code, § 16600(a)-(b).

The prohibition set forth in section 16600 extends to agreements restraining a former employee's ability to solicit their former employer's customers or employees. *See, e.g.*, *Fillpoint, LLC v. Maas*, 208 Cal. App. 4th 1170, 1182-83 (2012) (employees and customers); *Edwards*, 44 Cal. 4th at 948 (customers); *AMN Healthcare, Inc. v. Aya Healthcare Servs.*, 28 Cal. App. 5th 923, 935-39 (2018) (employees). Section 16600 renders such restraints void even if the former employee "uses information that is confidential but not a trade secret." *AMN Healthcare, Inc.*, 28 Cal. App. 5th at 940. Moreover, a former employee's use of trade secrets to unfairly

---

[6] The chapter excepts noncompetition agreements in the sale or dissolution of corporations, partnerships, and limited liability corporations. *See* Cal. Bus. Prof. Code, §§ 16601, 16602, 16602.5.

9

compete with their former employer may not be curbed by contract enforcement but must instead be enjoined as tortious conduct violative of CUTSA or unfair competition law. *See The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237-38 (2009).

Because it appears that the relevant CNSA provisions may be enforceable under Maine law but void under California law, there is sufficient conflict to require me to choose which jurisdiction's law applies to this contract matter. *See Philibotte v. Nisource Corp. Servs. Co.*, 793 F.3d 159, 165 (1st Cir. 2015) (stating that a federal court exercising supplemental jurisdiction must apply state substantive law). "The question of which state's law applies is resolved using the choice of law analysis of the forum state"—in this case, Maine. *Reicher*, 360 F.3d 1 at 4.

In Maine, the Restatement (Second) of Conflict of Laws (1971) governs choice of law issues in contract litigation. *See State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶ 46, 995 A.2d 651; *Long v. Fairbank Farms Reconstr. Corp.*, 824 F. Supp. 2d 197, 199 (D. Me. Oct. 25, 2011). Section 188 of the Restatement applies in the absence of an effective choice of law provision:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties . . ., the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, . . . place of incorporation and place of business of the parties.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 188.

> Section 6(2) sets forth the following general choice of law principles:
>
> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6(2).

Here, the parties negotiated and executed the CNSA in California. *See* Aragon Aff. ¶ 9. Web Design, AdMedia, and Ad.net (Aragon's new employer) all have their principal places of business in California. *See id.* ¶ 41; Bibi Decl. ¶¶ 6-7. Aragon resided and was domiciled in California until mid-December 2021, when he moved to Maine. *See* Aragon Aff. ¶¶ 8, 14-15. Finally, although Aragon's role with AdMedia required frequent travel to trade shows across the country, he was based in California for the majority of his employment. *See id.* ¶¶ 13-17; Bibi Decl. ¶ 17; Second Bibi Decl. ¶ 10. There is no evidence that either party justifiably expected the CNSA to be governed by one state's law over the other. However, on these facts, I find that California has a greater interest in this dispute than Maine. Considering how sharply California's laws governing the CNSA contrast with Maine's approach to the same issue, applying Maine law would improperly subvert California's strong public policy against non-competition and non-solicitation agreements.

Finally, contrary to the Company's assertion, section 196 of the Restatement

does not change my analysis. *See* Reply at 3-4; Restatement (Second) of Conflicts of Laws § 196. Section 196 dictates that service contracts are governed "by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered," unless "some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties." Restatement (Second) Conflict of Laws § 196. However, Maine has not adopted section 196 and, although the First Circuit in *Dinan v. Alpha Networks, Inc.*, 764 F.3d 64, 69 (1st Cir. 2014) predicted that it would, it is inapplicable to the CNSA. By its plain language, section 196 "applies if the major portion of the services called for *by the contract* is to be rendered in a single state and it is possible to identify this state *at the time the contract is made*." Restatement (Second) of Conflict of Laws § 196 cmt. a (emphasis added). Nothing in the CNSA suggested that Aragon would render services from a particular location. *See generally* CNSA. My conclusion is bolstered by the fact that section 196 warns against its effective application in choice of law analyses "when the work called for by the contract can be done in . . . two or more states," such as when an employee is required to travel fairly frequently. Restatement (Second) of Conflict of Laws § 196 cmts. a-b.

For these reasons, the weight of the factors set forth in sections 6(2) and 188(2) of the Restatement favor applying California law to the Company's contract claims. *See, e.g.*, *Shorter v. Peaches Uniform, Inc.*, No. 2:10-cv-02232-MCE-GGH, 2012 WL 3882322, at *4 (E.D. Cal. Sept. 6, 2012) ("Here, the Court concludes [under § 188] that the relevant contacts overwhelmingly favor the conclusion that Texas has

the greater interest in having its law applied. Texas was where the oral employment contract was negotiated and formed, as well as the headquarters for Peaches and the location where Shorter submitted her work. The only connection to California is Shorter's residence, which is otherwise unrelated to her employment."); *McCormack v. Medcor, Inc.*, No. 14 CV 3551, 2014 WL 5622172, at *5 (N.D. Ill. Nov. 4, 2014) ("Here, as in *Shorter*, only McCormack's residence weighs in favor of applying California law. The dispute is unrelated to her California residence. Instead, it turns on an employment agreement with an Illinois employer that was formed when McCormack was not even a California resident. [McCormack] performed the majority of her work outside of California, and the work she did from her home in California was unrelated to Medcor's business in the state. Accordingly, we find that Illinois has more relevant contacts to the present case than California, thus Illinois's interests would be more impaired if we did not apply its law.").

## V. Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012); *see also Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981) (stating that a judge should grant injunctive relief "sparingly"). When considering whether to grant or deny a preliminary injunction, the court must (1) "gauge the movant's likelihood of success on the merits," (2) "evaluate whether and to what extent the movant will suffer irreparable harm if injunctive relief is

withheld," (3) "calibrate the balance of hardships as between the parties," and (4) "consider the effect, if any, that the issuance of an injunction (or the withholding of one) will have on the public interest." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

### i. Non-Solicitation of Customers and Employees

The CNSA prohibits Aragon, during his employment and for three years post-termination, from "solicit[ing] or otherwise recruit[ing] or induc[ing] any employee of [the] Company to work for any other third party or to otherwise terminate his/her employment with [the] Company to work elsewhere," and from "us[ing] [the Company's] Customer Information to target or solicit [the] Company's Customers on behalf of himself . . . or any third party . . . ." CNSA at 2.

To put it plainly, the Company is unlikely to prevail on its claims that Aragon breached these non-solicitation provisions because California courts have deemed less restrictive versions of such provisions unenforceable under section 16600.

For example, in *Fillpoint, LLC v. Maas*, California's Court of Appeal for the Fourth District held that an agreement prohibiting a former employee, for one year post-termination, from soliciting their former employer's employees and current or prospective customers was void under section 16600 because it was unreconcilable "with California's strong public policy permitting employees the right to pursue a

14

lawful occupation of their own choice." 208 Cal. App. 4th at 1182-83; *see also AMN Healthcare, Inc.*, 28 Cal. App. 5th at 936-39 (holding that an agreement prohibiting travel nurse recruiters from soliciting or recruiting any travel nurses employed by or listed in their former healthcare employer's database for one year post-termination was void under section 16600 because it restricted the number of nurses with whom they could work and correspondingly limited their compensation).

Similarly, in *Dowell v. Biosense Webster, Inc.*, California's Court of Appeal for the Second District held that a clause barring former employees, for eighteen months post-termination, from soliciting any of their former employer's customers with whom they had contact in the last year of their employment was void under section 16600. 179 Cal. App. 4th 564, 574-79 (2009); *see also Edwards*, 44 Cal. 4th at 948 (holding that an agreement prohibiting a former employee, for eighteen months post-termination, from performing the type of services that he had provided while employed by his former employer for any client on whose account he had worked in the eighteen months prior to his employment termination was unenforceable under section 16600); *Galante*, 176 Cal. App. 4th at 1238 (holding that "section 16600 bars a court from specifically enforcing (by way of injunctive relief) a *contractual* clause purporting to ban a former employee from soliciting former customers to transfer their business away from the former employer to the employee's new business").

The Company cites three unreported federal district court decisions interpreting California law to support the enforcement of its non-solicitation clauses, none of which sway my conclusion. *See* Reply at 7-8. One case pertains to

pre-termination conduct, which is inapposite, and the other cases rely on *Loral Corp. v. Moyes*, 174 Cal. App. 3d 268 (1985). *See id.* Although California's Supreme Court has yet to explicitly overrule *Moyes*, it is highly unlikely that *Moyes's* reasonableness approach to analyzing non-solicitation clauses survived the court's interpretation of section 16600 in *Edwards*. *See Edwards*, 44 Cal. 4th at 946-50 (stating that California "rejected the common law 'rule of reasonableness'" by enacting the "unambiguous" section 16600, "and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect"); *AMN Healthcare, Inc.*, 28 Cal. App. 5th at 938-39 (doubting "the continuing viability of [*Moyes's* reasonableness standard] post-*Edwards*"). Ample non-binding authority supports this conclusion. *See, e.g.*, *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 227-29 (5th Cir. 2020) (holding that section 16600 voids non-solicitation clauses and cases to the contrary rely on *Moyes's* common law "rule of reasonableness" approach, which "must be abandoned due to *Edwards*"); *Race Winning Brands, Inc. v. Gearhart*, No. SACV 22-1446-FWS-DFM, 2023 WL 4681539, at *9-11 (C.D. Cal. Apr. 21, 2023) (collecting cases rejecting *Moyes* in favor of invalidating non-solicitation clauses under *Edwards*, and correspondingly holding that an employee non-solicitation agreement was void under section 16600).

### ii. Use and Disclosure of Confidential Information

The Company alleges that Aragon's disclosure and use of its confidential information violates the CNSA and MUTSA. *See* Amended Complaint ¶¶ 47-64. The former claim is unlikely to succeed because in California, contractual restraints

16

on an employee's post-termination ability to solicit customers using their former employer's confidential information are unenforceable under section 16600. *See Galante*, 176 Cal. App. 4th at 1237-38 (explaining that, pursuant to section 16600, a former employee's use of confidential information to solicit their former employer's customers may not be curbed by contract enforcement). Indeed, it is only if the confidential information contains trade secrets that an employer may seek to enjoin the former employee's use of that information as tortious conduct violative of CUTSA or unfair competition law. *See id.* at 1238 (emphasizing that the former employee's conduct must be "wrongful independent of any contractual undertaking").

The latter claim—that Aragon violated MUTSA—falls short of necessitating injunctive relief on separate ground. MUTSA permits courts to enjoin the "[a]ctual or threatened misappropriation" of trade secrets. 10 M.R.S. § 1543(1). Even if I assume that the Company proved its confidential information to be protectable trade secrets, *see id.* § 1542(4) (defining "trade secret"), and that Aragon used those trade secrets to solicit its customers, *see id.* § 1542(2) (defining "misappropriation"), the Company has failed to establish that Aragon's conduct is causing it irreparable harm.

The Company alleges that it will suffer irreparable harm in the absence of injunctive relief because its loss of goodwill and customer relationships cannot be measured in monetary damages, and that its injury is not speculative because seventeen customers have left in the six months since Aragon resigned, one of which

17

began doing business with Ad.net.[7]  *See* Amended Motion at 16; Reply at 11-12.

I am unconvinced that the Company's loss in customers cannot be remedied with monetary damages.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 74 (D. Me. 1993) (explaining that "the availability of money damages at law in the future cuts heavily against a conclusion that the injury . . . is irreparable in nature," notwithstanding the difficulty of determining the amount of such an award) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *see also OfficeMax Inc. v. Cnty. Qwick Print, Inc.*, 709 F. Supp. 2d 100, 113 (D. Me. 2010) ("It is a longstanding axiom that economic harm in and of itself is not sufficient to constitute irreparable injury." (cleaned up)).  Calculating the monetary damages that would successfully redress the loss of the Company's customers may require more extensive discovery, but it is not impossible.  *See Bishop*, 839 F. Supp. at 74-75, 75 n.5 (suggesting that the economic losses sustained as a result of a former employee soliciting their former employer's customers could be calculated through evidence of the history of earnings on those customers' accounts and expert testimony).  Indeed, the Company appears to have already calculated its economic losses.  *See* Reply at 11 (stating that, as a result of seventeen customers departing, the Company "stands to lose approximately $1,620,000 in anticipated revenue *per month*").

I am also unpersuaded that the Company's purported loss of goodwill is enough

---

[7] The Company also argues that it will be "severely harm[ed]" if Aragon discloses its pricing information to Ad.net or to AdMedia's actual or prospective customers because "once that disclosure occurs, there is no undoing it, nor is there a reasonably accurate method of accounting for the damage it will cause . . . ."  *See* Amended Motion at 16.  I will construe this as an extension of the Company's argument that it will be irreparably harmed by the loss of its current and prospective customers.

18

to show irreparable harm.  The Company states that Aragon's use of its confidential information and solicitation of its customers has caused "damage to relationships with clients who perceive the [C]ompany as being unable to protect their information" and a "loss of trust from existing and potential clients."  Bibi Aff. ¶ 40.  Because these allegations are speculative and lack specificity—indeed, the Company neglected to further develop or even mention these points in either of its briefs—they are insufficient to support a finding of irreparable harm.  *See Everett J. Prescott, Inc. v. Ross,* 383 F. Supp. 2d 180, 191 (D. Me. 2005) ("Speculative injury does not constitute a showing of irreparable harm." (cleaned up)); *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("[I]rreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

Finally, because the Company has not established its entitlement to preliminary injunctive relief, I need not determine whether to order Aragon to return its equipment or send the Company copies of and then delete any confidential information in his possession.

## VI.  Conclusion

For the aforementioned reasons, the Company's amended motion for a preliminary injunction is ***DENIED***.

Dated: March 31, 2025

/s/ Karen Frink Wolf
United States Magistrate Judge

19